UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : Criminal No. 25-CR-23 (DLF) |
| v. | : |
| ROBERT WILLIAMS, | : |
| Defendant. | : |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and undersigned counsel, hereby files its sentencing memorandum to assist the Court's consideration of the relevant issues. As noted below, Defendant Robert WILIAMS ("WILLIAMS") faces an advisory Guidelines range of 57 months to 71 months. For the reasons articulated below, the United States respectfully recommends that the Court impose a sentence of **64** months' imprisonment to be followed by 36 months' supervised release.

### FACTUAL BACKGROUND

On Friday, January 10, 2024, members of the MPD's Robbery Suppression Unit were working the evening tour of duty. At 10:58 p.m. investigators observed a silver Volkswagen bearing D.C. tags (JM-2271) driving westbound on Florida Avenue, Northwest. Sergeant Possinger saw the vehicle attempt to turn south on the 1900 block of 7th Avenue, Northwest, however, the vehicle failed to clear the intersection due to traffic congestion, and the rear of the vehicle obstructed the crosswalk. Investigators activated their emergency equipment and attempted to conduct a traffic stop, but the vehicle fled westbound in the 700 block of S Street, Northwest. Investigators then deactivated their emergency equipment and attempted to conduct surveillance on the vehicle.

The vehicle was subsequently seen driving in the 900 block of R Street, Northwest.

1

Investigators again activated their emergency equipment; the vehicle stopped, and a man identified as WILLIAMS exited the driver's seat and fled on foot.  Investigators Arnone, Guzman, Possinger and Todd gave chase.  During the chase, WILLIAMS ignored Investigator Todd's repeated orders to stop.  WILLIAMS was eventually caught and arrested in a residential backyard near 900 R Street, Northwest.

Back at the scene of the traffic stop, Defendant Daron Brown stayed in the front passenger seat of the vehicle as WILLIAMS fled.  Investigator Choi, who was in a separate car, exited his vehicle with his gun drawn and ordered Brown to exit the vehicle.  As Choi approached, he saw a gun on the front driver's seat where WILLIAMS was sitting, later identified as a Glock, Model 23, .40 caliber semi-automatic pistol with serial number DVX608 loaded with one round in the chamber and 20 rounds in a 22-round high-capacity magazine.  *See* Figure 1.



*Figure 1: Glock 23, .40 Caliber with 22-round Magazine*

Investigator Choi then opened the front passenger door where Brown was sitting and pulled Brown out of the vehicle.  Brown had a blue coat in his lap.  *See* Figure 2.  As Brown was pulled out of the vehicle he put the coat back onto the seat.  *See* Figure 3.  Once outside the vehicle Brown

2

appeared to comply, attempted to run but was eventually restrained. Shortly thereafter, Officer Simeon Norfleet conducted a search of the vehicle and located a second gun with a Glock converter, giggle switch under the blue coat on the front passenger seat where Defendant Brown was sitting. *See* Figure 4.



*Figure 2: Defendant Brown in Vehicle with Blue Coat on his Lap*

      

*Figure 3: Blue Coat on Front Passenger Seat*      *Figure 4: Second Gun with Giggle Switch*

3

Officer Todd then searched Williams incident to arrest which revealed 12 zips of a white rocklike substance that was field tested but was inconclusive in Williams's jacket pocket. A further search revealed 44 multicolored pills that field tested positive for MDMA, otherwise known as ecstasy. *See* Figure 5.



*Figure 5: White Rocklike Substance & MDMA*

A search of the vehicle by Officer Norfleet revealed suspected PCP from a jacket pocket that was recovered from the driver's seat where WILLIAMS was sitting. *See* Figure 6-7. The PCP was in a 2-ounce vial that was twenty-five percent full. *See* Figure 8. Additionally, six .40 caliber rounds of loose ammunition were recovered from the front driver's side compartment, as well as a bottle of alcohol from the center console.



*Figure 6: Jacket Recovered*



*Figure 7: 2 Ounce Vial of PCP*



*Figure 8: 2 ounce of PCP that was ¼ full*

WILLIAMS had been previously convicted of a crime punishable by imprisonment for a term exceeding one year in D.C. Superior Court Case Number 2021 CF2 4246 for Attempted Assault with a Dangerous Weapon and Unlawful Possession of a Firearm.

## PROCEDURAL HISTORY

On January 22, 2025, a federal grand jury returned a two-count indictment charging WILLIAMS and Brown with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. Both defendants were arrested on January 24, 2025, where they were arraigned. ECF Nos. 5, 6. On March 25, 2025, WILLIAMS pled guilty to Count Two of 18 U.S.C. § 922(g)(1). ECF No. 24.

Sentencing is scheduled for Tuesday, July 1, 2025, at 1:30 p.m.

## LEGAL STANDARD

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The

Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see also United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) ("*Booker* has not changed how the Guidelines range is to be calculated."). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007); *Dorcely*, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

    The listed factors in 18 U.S.C. § 3553(a) include the following:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed –
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3) the kinds of sentences available;

    (4) the kinds of sentence and the sentencing range established for –
        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
            i. issued by the Sentencing Commission ...; and
            ii. that, . . . are in effect on the date the defendant is sentenced; ...

    (5) any pertinent policy statement –
        (A) issued by the Sentencing Commission ... and
        (B) that, . . . is in effect on the date the defendant is sentenced.

    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7) the need to provide restitution to any victims of the offense.

## SENTENCING GUIDELINES CALCULATIONS

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *United States v. Flores*, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation. As noted:

> In the post-*Booker* world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range."

U.S.S.G. § 1B1.3, Commentary, Background.

Here, the parties agreed the offense level to be 24, ECF No. 24 (Plea Agreement), and the defendant's Criminal History to be a Category IV. Thus, the agreed upon guidelines range, as set forth below, is 57-71 months' imprisonment.

## THE GOVERNMENT'S SENTENCING RECOMMENDATION

The crime at issue here merits a sentence of 64 months' incarceration.[1] This sentence—in the middle of the agreed upon guidelines range—reflects the serious nature of this offense and agreed-to conduct in the Statement of Offense, ECF No. 25, WILLIAMS's criminal history and characteristics, and provides adequate deterrence to others in the community, particularly given

---

[1] The PSR's recommendations are based on a higher range of guidelines because probation calculated the defendant's base offense level to be 22 pursuant to USSG §2K2.1(a)(3)(A)(i). While the government agrees with probation, the government agrees to allocate within the guidelines in the plea agreement—57-71 months' imprisonment. ECF No. 34.

8

the danger presented by the carrying of loaded firearms with an extended, high capacity magazine.

As stated above, the government requests that the Court sentence the defendant to 64 months' imprisonment, to be followed by three years of supervised release.

### *The Nature and Circumstances of the Offense*

The nature and circumstances of this offense are serious and warrant a sentence of 64 months' imprisonment. As a threshold matter, WILLIAMS's possession of a loaded semi-automatic pistol was an inherently dangerous act that placed the community at risk. *See, e.g., United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence").

People carry guns because they intend to use them. And while the defendant's crime did not result in any direct violence against another, unlawful possession can lead to dangerous consequences, thereby underscoring the need to take such crimes seriously. This is especially true here given the defendant's possession of a .40 caliber pistol fitted with an extended capacity magazine.



*Figure 1: Glock 23 with One Round in the Chamber and 20 Rounds in a 22-Round Capacity*

This firearm was found on the front driver's seat—not secured or safely stored in a gun locker or the car's glove box. The defendant was also found to be in possession of 12 zips of a rocklike substance, 44 multicolored pills that field tested positive for MDMA (otherwise known as ecstasy), and a vile of PCP that was a quarter full. Increasing the likelihood that he, or someone else, would make a rash and fatal decision with that illegal deadly weapon. Here, the defendant had direct access to a loaded high-capacity semi-automatic firearm along with multiple controlled substances.

In view of the nature and circumstances of this offense, a sentence of 64 months' imprisonment is warranted.

### *The History and Characteristics of the Defense*

Although the defendant has accepted responsibility for his actions in this case, his unlawful possession of the Glock 23 fitted with a high-capacity magazine is particularly troubling considering his criminal history as set forth in the PSR beginning on page 7. As detailed above, the defendant's criminal history category is IV.

At the time he was arrested in this case, WILLIAMS was on supervised release in D.C. Superior Court case number 2021 CF2 4246 for Attempted Assault with a Deadly Weapon and an Unlawful Possession of a Firearm. In that case, the defendant was involved in a fender bender accident with another person, after which he brandished a black semi-automatic handgun and pointed it at the victim. A Glock, Model 19, 9mm semi-automatic pistol was recovered from under the driver's seat of WILLIAMS's car pursuant to a search warrant.

In 2015, WILLIAMS was also convicted of Robbery in the Maryland Circuit Court for Montgomery County case number 127294C where he was sentenced to five years' incarceration and three years' probation. In that case, WILLIAMS entered a bank through the rear door, looked

around in a suspicious manner, and left without asking for any assistance. About three minutes later, another individual entered the bank, approached the teller, and slid a note under the window. The note read: "Do not make a sound or any hand gestures of the bomb in my bag will explode. Now follow my instructions and hand me $6,000 dollars in unmarked and untraceable bills. Do not tell anyone about this or try to have me followed when I leave or the bomb will explode." PSR 14. WILLIAMS later violated his probation when he was arrested in Arlington, Virginia for Grand Larceny and Conspiracy to Commit Grand Larceny in case numbers GC160016532 and GC16001533. He also violated his probation when he was arrested, and later convicted, for shoplifting in Washington D.C. Superior Court case number 2016 CMD 858. His probation was revoked in 2017, and, finally, his case was closed unsatisfactorily when he violated probation again in 2019. PSR 15.

WILLIAMS has additional convictions ranging in severity and sentence, including the following: 30 days incarceration (all suspended) and six months supervised probation in D.C. Superior Court case number 2018 CMD 8583 for possession of a controlled substance; 180 days incarceration (all suspended) and six months supervised probation in D.C. Superior Court case number 2017 CMD 009 for possession of dibutylone; 180 days incarceration (154 days suspended) in Virginia Arlington General District Court case number GC16001532-00 for petit larceny; 30 days incarceration (all suspended) and six months supervised probation in D.C. Superior Court case number 2016 CMD 858 for shoplifting; 90 days incarceration (50 days suspended) and one year, two months, and eleven days of probation in Maryland District Court for Montgomery County in case number 3D00332766 for theft; one year supervised probation in D.C. Superior Court case number 2015 CMD 5051 for theft; 90 days incarceration (88 days suspended) and 3 years of probation in Maryland Circuit Court for Montgomery County in case number 128234C

11

for theft and attempted theft; 180 days incarceration (all suspended) and 30 days supervised release in D.C. Superior Court case number 2014 CMD 19890 for theft; and 180 days incarceration (all suspended) and one year probation in D.C. Superior Court case number 2014 CF2 19736 for attempted robbery accessory after the fact.

The defendant has been given multiple sentences of incarceration and continues to commit crimes—even while on probation or supervised release. His behavior has become more erratic as the years have gone on. His criminal activity has escalated in conduct and in firepower. Here, the defendant displayed his most dangerous behavior by possessing a high capacity loaded semi-automatic firearm along with multiple controlled substances, all while on supervised release for an attempted assault with a deadly weapon and unlawfully possessing a firearm. The defendant's criminal history indicates that he is becoming more volatile and dangerous to the community, and the Government asks the Court to impose a sentence severe enough to deter him from a continued escalation of his criminal conduct.

### *The Need for the Sentence Imposed*

Given the defendant's criminal history and proclivity towards violence, the requested sentence is necessary but not greater than necessary to meet the goals of sentencing. The defendant's crimes are not isolated from the community he lives in, rather unlawful possession of firearms directly impacts the community and the people who live in it. In Washington D.C., violent crimes with firearms have risen over the past three years when compared to the previous three.[2] The defendant has not only contributed to this statistic but has continued to escalate his criminal conduct while in possession of a firearm along with multiple controlled substances.

This is not the defendant's first time illegally carrying a firearm. The fact that the

---

[2] *Crime Cards*, Metro. Police Dep't
https://crimecards.dc.gov/all:violent%20crimes/with%20a%20gun/3:years/citywide:heat (last visited June 2, 2025).

12

defendant previously has pled guilty to a felony that involved firearms is evidence that his past lengthy criminal sentences have not adequately deterred his criminal conduct and shows that a substantial prison term is necessary to deter the defendant from unlawfully possessing firearms in the future.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 64 months incarceration followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


By: ___/s/ *Haley M. Pennington*
HALEY M. PENNINGTON
Special Assistant United States Attorney
Illinois Bar No. 6349612
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-740-4684
Email: haley.pennington2@usdoj.gov